## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TRI-CITY COMMUNITY | ) | Chapter 11 Case |
| ACTION PROGRAM, INC., | ) | No. 15-11569-JNF |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| TRI-CITY COMMUNITY | ) | |
| ACTION PROGRAM, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding |
| | ) | No. 17-01035-JNF |
| PHILIP BRONDER-GIROUX, and | ) | |
| ANN HOWSER. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF MOTION OF PHILIP BRONDER-GIROUX FOR SUMMARY JUDGMENT

Philip Bronder-Giroux is entitled to summary judgment on Tri-CAP's single count for breach of fiduciary duty for three independently sufficient reasons. First, Tri-CAP cannot prove the elements of duty or breach without expert testimony, which it has failed to produce. Second, Mr. Giroux at all times acted in good faith and is therefore shielded by the common law business judgment rule. Third, Mr. Bronder-Giroux is shielded from liability by the exculpatory provisions of G.L. c. 180, § 6C because he reasonably relied on financial information and legal advice from specialists more qualified than himself.

1

## I.  FACTS[1]

### A.  Tri-CAP's Mission and Leadership Structure

Tri-CAP is a Massachusetts nonprofit corporation. Tri-CAP's charitable mission was to alleviate poverty, and its causes and effects, in its catchment area, including the cities of Everett, Malden, and Revere.[2] In furtherance of its charitable mission, Tri-CAP developed and operated certain social services programs on behalf of its constituents.[3] Those programs included, among others, Head Start preschool education programs, subsidized home heating fuel deliveries, home weatherization assistance, subsidized low income housing, and homelessness prevention.[4]

Anne Howser joined Tri-CAP in 1984.[5] At that time, Tri-CAP segregated grant funds into separate bank accounts.[6] In approximately 1987, Tri-CAP purchased and transitioned its accounting to the Grants Management System ("GMS").[7] To use GMS, Tri-CAP was required to close its separate accounts and comingle grant funds into just two or three accounts. Representatives from the Massachusetts Department of Housing and Community Development ("DHCD") and the U.S. Dept. of Health and Human Services ("HHS") visited Tri-CAP  prior to

---

[1] The fact citations herein are to Philip Bronder-Giroux's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("SUMF"), which is being filed herewith. The SUMF contains pin citations to the supporting evidence, which is contained in the Summary Judgment Appendix of Philip Bronder-Giroux, also being filed herewith.

[2] SUMF at ¶ 1.

[3] Id. ¶¶ 2-3.

[4] Id. at ¶ 3.

[5] Id. at ¶ 4.

[6] Id. at ¶ 5.

[7] Id. at ¶ 6.

the GMS transition and approved it, including specifically Tri-CAP's commingling of grant funds.[8]

Philip Bronder-Giroux joined Tri-CAP as Executive Director in 1994.[9] By that time, Anne Howser was Tri-CAP's comptroller, and she and her fiscal office had seven years' experience with GMS.[10]

Mr. Bronder-Giroux holds a master's degrees in divinity and public administration.[11] He does not hold degrees in accounting or finance.[12] Over nearly twenty years of positive experience, Mr. Bronder-Giroux developed a deep level of trust in Mr. Howser, whom Mr. Bronder-Giroux testified had been "a very reliable and very competent comptroller for a lot of years."[13]

Tri-CAP's bylaws describe agency's corporate structure.[14] As of 2011, the bylaws provided that Tri-CAP's "Treasurer shall be the chief financial officer of the corporation and have the responsibility for oversight for the proper financial management of the corporation funds and assets."[15] Tri-CAP's Treasurer was at all times, as required by the bylaws, a member of the Board.[16] The Treasurer/CFO was to serve as the chair of the Finance Committee.[17] The express purpose of the Finance Committee was "to assure the development of effective

---

[8] SUMF at at ¶ 7.
[9] Id. at ¶ 10.
[10] See id. at ¶¶ 4-9.
[11] Id. at ¶ 11.
[12] Id. at ¶ 12.
[13] Id. at ¶ 13.
[14] Id. at ¶ 14.
[15] Id. at ¶ 15.
[16] Id. at ¶ 16.
[17] Id. at ¶ 17.

administrative support for programs that will *ensure competent financial administration of the agency*, and to mobilize community resources."[18]

At no point was Mr. Bronder-Giroux ever the Treasurer of Tri-CAP.[19] Rather, for Mr. Bronder-Giroux's part, the bylaws state that the "Executive Director shall be appointed by the Board . . . and shall serve at its pleasure and shall be the chief administrative officer of the corporation; shall be responsible for carrying out the policies and programs of the corporation and the directions of the Board . . . and perform such other functions as set forth by the Board from time to time."[20] At all material times, Tri-CAP's Treasurer was Charlie Harak.[21]

### B. **Ms. Howser Reveals an Accounting Problem.**

In September 2013, Ms. Howser reported to Mr. Bronder-Giroux that she had made an accounting error resulting in a significant overspend in FY 2013.[22] Mr. Bronder-Giroux immediately reported this issue to the Board.[23] At the time of her disclosure, Ms. Howser assured Mr. Bronder-Giroux that Tri-CAP had sufficient unrestricted funds on hand to cover the deficit.[24]

On October 22, 2013, Tri-CAP's external financial auditors at Danial Dennis & Co. informed Mr. Bronder-Giroux for the first time that its audit report for FY 2013 might include a going concern notation in the footnotes.[25] Mr. Bronder-Giroux was "caught off guard" by this

---

[18] SUMF at ¶ 18.
[19] Id. at ¶ 19.
[20] Id. at ¶ 20.
[21] Id. at ¶ 21.
[22] Id. at ¶ 22.
[23] Id. at ¶ 24.
[24] Id. at ¶ 23.
[25] Id. at ¶ 25.

revelation.[26] Mr. Bronder-Giroux promptly disclosed this information to the Board, where it was

discussed at length during executive session at a meeting of the Finance Committee on October

31, 2013, and again at length during a full Board meeting on November 4, 2013.[27] When the

auditors had finished, it was revealed to Mr. Bronder-Giroux and the Board that Tri-CAP had

lost $571,630 in FY 2013.[28] Through conversations with Daniel Dennis & Co., Mr. Bronder-

Giroux and the Board in November 2013 learned for the first time that Ms. Howser had, in FY

2013, maxed out Tri-CAP's two $100,000 lines of credit with Eagle Bank and used

approximately $50,000 in restricted funds to meet the agency's operational needs.[29]

Importantly, Tri-CAP's independent auditors had never before raised a going concern

issue.[30] Based on Tri-CAP's audit history, Mr. Bronder-Giroux reasonably believed prior to

October 22, 2013, that Tri-CAP was fiscally sound.[31]

C. **General Overview of Tri-CAP's Efforts to Survive.**

His trust in Ms. Howser irreparably shaken, on or about November 21, 2013, and with

the Board's approval, Tri-CAP engaged the services of Tammy Glivinsky as a fiscal

management consultant.[32] Ms. Glivinsky was recommended to Tri-CAP by one of its principal

funding sources, DHCD.[33] With Ms. Glivinsky's expert input regarding Tri-CAP's finances, Mr.

Bronder-Giroux prepared a management plan to address Tri-CAP's fiscal issues.[34] The

---

[26] SUMF at ¶ 26.
[27] Id. at ¶ 26.
[28] Id. at ¶ 27.
[29] Id.
[30] Id.
[31] See id.
[32] Id. at ¶¶ 29-30.
[33] Id. at ¶ 30.
[34] Id. at ¶ 31.

management plan recognized that the "long term future stability of the Agency will rely heavily on a one-time ability to turn fixed assets into cash."[35] Among the management plan's recommendations, therefore, was the sale of Tri-CAP's majority interest in 54 Eastern Ave., LLC.[36]

In approximately January 2014, Tri-CAP terminated Ms. Howser's employment.[37] Due to Ms. Howser's unique knowledge of Tri-CAP's accounting systems, however, she was retained on a consulting basis for a number of months into 2014.[38]

By April 2014, Mr. Bronder-Giroux believed he had secured a buyer for 54 Eastern Ave., LLC – another non-profit called "Heading Home."[39] The anticipated sale would have netted Tri-CAP $344,000, which Mr. Bronder-Giroux believed "was a very, very big part of Tri-CAP's proposed plan to emerge from a nearly $500,000 deficit."[40] Mr. Bronder-Giroux had received assurances from Heading Home's executive director that Heading Home was going to close the deal.[41] On April 28, 2014, however, Mr. Bronder-Giroux learned that the sale had fallen through.[42] Four days later, on May 2, 2014, Mr. Bronder-Giroux issued a sobering report to Tri-CAP's Board, including a recommendation that they explore bankruptcy.[43]

During the subsequent month, Charlie Harak and Mr. Bronder-Giroux attended a meeting, arranged by Mr. Harak, with attorneys from Rich May, P.C. to discuss the possibility

---

[35] SUMF at ¶ 31.
[36] Id. at ¶ 31.
[37] Id. at ¶ 32.
[38] Id.
[39] Id. at ¶ 33.
[40] Id. at ¶ 34.
[41] Id. at ¶ 35.
[42] Id. at ¶ 36.
[43] Id. at ¶¶ 37-38.

of putting Tri-CAP into bankruptcy.[44] After discussions with counsel at Rich May, P.C., the Board elected <u>not</u> to file for bankruptcy at that time.[45] Instead, Rich May, P.C. agreed to lend some *pro bono* assistance, including helping to identify new donors and/or strategies to raise unrestricted funds for Tri-CAP.[46]

Meanwhile, Tammy Glivinsky prepared week-by-week cash flow projections for the months of June, July, and August 2014, indicating that Tri-CAP could continue to be a "going concern" at least through the end of that period.[47]

The Treasurer reported to the Board on June 18, 2014, that Rich May, P.C., the attorneys Tri-CAP had consulted concerning possible bankruptcy, was working with Tri-CAP's largest vendor, National Grid, towards an agreement to delay payment by Tri-CAP till October 2014.[48] The Treasurer also reported that Tri-CAP had decided to terminate its contract with Tammy Glivinsky in favor of retaining Ronald Pierre-Louis as part-time CFO at half Ms. Glivinsky's rate.[49] The Treasurer also reported that Mr. Bronder-Giroux was exploring another possible partnership to capitalize on Tri-CAP's interest in 54 Eastern Ave., LLC.[50] As of June 18, 2014, the Treasurer was projecting a FY 2014 deficit of $40,000.[51]

Charlie Harak summed up Tammy Glivinsky's tenure as fiscal consultant this way: "Almost every month we were saying, Tammy, are we making or losing money? We need to

---

[44] <u>Id.</u> at ¶¶ 42-44.
[45] <u>Id.</u>
[46] SUMF at ¶ 44.
[47] <u>Id.</u> at ¶¶ 45-46.
[48] <u>Id.</u> at ¶ 49.
[49] <u>Id.</u> at ¶ 50. Ronald Pierre-Louis "was highly recommended by other CAP agencies with which he has worked." <u>Id.</u> at ¶ 51.
[50] <u>Id.</u> at ¶ 52.
[51] <u>Id.</u> at ¶ 53.

figure this out. She said I think you're doing okay. And then Ron [Pierre-Louis] came in in the

summer of 2014, and that's when we realized how horrible it was."[52]

But Mr. Pierre-Louis did not communicate "how horrible it was" right away.[53] At the

September 18, 2014, Board meeting, the Treasurer reported that Tri-CAP's draft FY 2014 balance

sheet showed a *surplus* of $29,882, compared with the FY 2013 *deficit* of ($394,287), noting "[t]his

is a great turnaround."[54] The Treasurer also reported that "Cash on Hand ratios" had

improved.[55] And as of that meeting, the minutes reflect that Tri-CAP had every intention of

continuing its Head Start program.[56]

On October 2, 2014, the Administration for Children and Families ("ACF") notified Tri-

CAP that by letter (the "ACF Letter") that ACF had designated Tri-CAP "as a 'high risk/special

award conditions' Head Start grantee," which Mr. Bronder-Giroux reported to the Board the

next day.[57] At the October 6, 2014, Board meeting, the Board authorized Mr. Bronder-Giroux to

alert ACF that Tri-CAP was leaning towards relinquishing its Head Start Grant.[58]

On October 22, 2014, Mr. Bronder-Giroux wrote to the Board President and Treasurer to

report a call received that morning from an HHS employee, who had received a copy of the

ACF letter, raising concerns about Tri-CAP's ability to monitor the LIHEAP program.[59] Mr.

Bronder-Giroux also reported that Tri-CAP had that morning received a summons with regard

---

[52] SUMF at ¶ 54.

[53] See id. at ¶¶ 54-56.

[54] Id. at ¶ 56. At the June 18, 2014 Board meeting two months prior, the Treasurer projected a FY 2014 *deficit* of ($40,000). Id. at ¶ 53.

[55] Id. at ¶ 57.

[56] Id. at ¶ 58.

[57] Id. at ¶ 59.

[58] Id. at ¶ 60.

[59] Id. at 62.

to a residential oil spill.[60] Finally, Mr. Bronder-Giroux reported that he expected Tri-CAP's

annual gala at the end of October would raise less than the $14,000 raised in 2013.[61] Mr.

Bronder-Giroux was despondent: "Quite honestly, *I don't see a way out.* I am completely and

utterly demoralized and don't feel that I can continue to lead the Agency."[62] Mr. Bronder-

Giroux resigned from Tri-CAP on December 1, 2014.[63]

> With the benefit of hindsight, Charlie Harak summed up Tri-CAP's demise this way:

>> The first hint was in the FY 13 audit that came out in November of 2013, which reported a large deficit. And we started to ask – and so we were told that there was a very large error made in our Head Start program which was – let's say it was a per-capita kind of reimbursement, except Anne thought it was a cost reimbursement. So she was booking all of the costs as a receivable, but in fact it was a capped contract. And she made a very large error there.

>> And then there were – but that didn't add up to all of the error. *And so for most of 2014 we were trying to figure out what other errors – and only I think in 2015 did we find out that there were errors being made in our housing programs, probably in our energy programs, and in the Head Start program.*[64]

### D.  Plaintiff's Expert Report.

Tri-CAP served an expert report by Craig R. Jalbert of Verdolino & Lowey, P.C., on June

17, 2019.[65] Mr. Jalbert opines on the issue of when Tri-CAP became insolvent. Mr. Jalbert further

attempts "to ascertain the likelihood that former officers of [Tri-CAP] were aware of the

Company's alleged insolvency."[66]

---

[60] SUMF at ¶ 62.

[61] Id.

[62] Id. at ¶ 62.

[63] Id. at ¶ 66.

[64] Id. at ¶ 64.

[65] Mr. Bronder-Giroux does not concede that any of the testimony described in Mr. Jalbert's report would be admissible at trial, and Mr. Bronder-Giroux expressly reserves the right to challenge any such testimony, if and when necessary.

[66] Expert Report at 1. This putative testimony is patently inadmissible under Fed. R. Evid. 702.

Critically, however, neither Tri-CAP nor Mr. Jalbert offers any expert opinion

concerning the standard of care that Mr. Bronder-Giroux owed to Tri-CAP. And neither Tri-

CAP nor Mr. Jalbert offers any expert opinion concerning whether anything Mr. Bronder-

Giroux did or failed to do deviated from the applicable standard of care.[67] Mr. Jalbert's report is

therefore not material to the dispositive issues at bar.

**E.  Procedural History.**

In spite of Mr. Bronder-Giroux's "no way out" warning to the Board on October 22,

2014, Tri-CAP's Board did not put Tri-CAP into bankruptcy until more than six months later, on

April 23, 2015, when Tri-CAP petitioned for reorganization under Chapter 11.

On April 12, 2017, the Court allowed a motion of the Official Committee of Unsecured

Creditors ("Committee") "to assert and prosecute insider claims in the name of and on behalf of

the Debtor's estate."[68] On April 21, 2017, the Committee filed the instant Adversary Proceeding.

Tri-CAP's Complaint asserts a single count against Mr. Bronder-Giroux for breach of fiduciary

duty (Count I).[69]

On July 12, 2017, the Bankruptcy Court approved Tri-CAP's liquidating Chapter 11 Plan

(the "Plan"). Pursuant to the Plan, the Estate Causes of Action were transferred to the Creditor

Trust (the "Trust"). The Plan defines "Estate Causes of Action," in relevant part, as "all

prepetition claims and causes of action of the Debtor that by operation of Code Section 541(a)

have become property of the Estate as of the Effective Date, including without limitation the

---

[67] Nor, based on the qualifications described in his report, would Mr. Jalbert be qualified to offer any such opinions.
[68] In re Tri-CAP, Bankr. D. Mass. No. 15-11569, docket entry 135 at 1 (emphasis added).
[69] See Complaint, docket entry 3 at ¶¶ 18-34.

Officer Claims . . . . Estate Causes of Action shall not include any claims or causes of action . . .

held by entities other than the Debtor."[70]

The deadlines for fact discovery and expert discovery have all passed. Mr. Bronder-Giroux now moves for summary judgment on Count I.

## II.   ARGUMENT

### A.   Applicable Legal Standards

#### 1.   The Summary Judgment Standard.

Summary judgment is appropriate where the record shows that there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "The moving party bears the initial burden of informing the trial court of the basis for his motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). "Once the moving party has accomplished this feat, the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Id. "As a general rule, that requires the production of evidence that is significantly probative." Id. "If the nonmovant fails to make this showing, then summary judgment is appropriate." Id.

There are at least three dispositive issues about which there is no dispute of material fact which compel the entry of summary judgment in favor of Mr. Bronder-Giroux:

---

[70] In re Tri-CAP, Bankr. D. Mass. No. 15-11569, docket entry 141-1 at 4.

First, it is undisputed that Tri-CAP has no expert witness to prove the elements of duty

or breach in support of its fiduciary duty claim. Expert testimony is required, however, because

the care required of a community action program's executive director under the peculiar

circumstances of this case is "beyond the ken" of lay factfinders. See Cruickshank v. Cook,

CIV.A. 13-11247-GAO, 2014 WL 2615364, at *1 (D. Mass. June 12, 2014) and the First Circuit,

affirming that decision, sub nom. In re Envtl. Careers Org., Inc., 597 Fed. Appx. 1 (1st Cir. 2015)

(unpublished).

Second, it is undisputed that Mr. Bronder-Giroux at all times acted with the utmost good

faith, and is thus shielded from personal liability by the business judgment rule. See MAZ

Partners LP v. Shear, 204 F. Supp. 3d 365, 375 (D. Mass. 2016), on reconsideration in part, 218 F.

Supp. 3d 132 (D. Mass. 2016); Spiegel v. Beacon Participations, Inc., 297 Mass. 398, 411 (1937).

Third, it is undisputed that Mr. Bronder-Giroux reasonably relied upon financials and

legal advice from specialists more knowledgeable than himself, including without limitation:

Tri-CAP's outside auditors at Daniel Dennis & Co.; Anne Howser (prior to September 2013);

Tammy Glivinsky; Ronald Pierre-Louis; and Rich May, P.C. Accordingly, Mr. Bronder-Giroux is

entitled to statutory protection from personal liability pursuant to G.L. c. 180, § 6C.

## B. Tri-CAP Cannot Prove Either the Applicable Standard of Care or Deviation Therefrom Without Expert Testimony.

By statute, Mr. Bronder-Giroux owed Tri-CAP the duty exercise "such care as an

ordinarily prudent person in a like position with respect to a similar corporation organized

under this chapter would use under similar circumstances." G.L. c. 180, § 6C.[71] Mr. Bronder-

---

[71] A[n] . . . officer . . . shall perform his duties as such . . . in good faith and in a manner he reasonably
believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person

Giroux was the executive director of a community action program faced with a fiscal crisis that arose in Fall 2013, when the comptroller reported a significant accounting error. There is plenty of evidence concerning the evolution of that crisis, as well as Mr. Bronder-Giroux's admirable efforts to deal with it. See generally SUMF. But there is zero evidence about what "an ordinarily prudent person in a like position . . . under similar circumstances" would have done, or whether Mr. Bronder-Giroux's actions deviated from that standard.

The decisions of the United States District Court for the District of Massachusetts in Cruickshank v. Cook, CIV.A. 13-11247-GAO, 2014 WL 2615364, at *1 (D. Mass. June 12, 2014) and the First Circuit, affirming that decision, sub nom. In re Envtl. Careers Org., Inc., 597 Fed. Appx. 1 (1st Cir. 2015) (unpublished), are directly on point. See also Exergen Corp. v. Kaz USA, Inc., CV 13-10628, 2015 WL 4506472, at *4 (D. Mass. July 24, 2015) (granting defendant's motion for summary judgment in patent infringement because plaintiff lacked necessary expert testimony on a dispositive substantive matter that was "beyond the ken" of lay factfinders); Gables at Sterling Village Homeowners Assn., Inc. v. Castlewood-Sterling Village I, LLC, 417 P.3d 95, 111-14 (Utah 2018) (affirming summary judgment for developer because there was no expert evidence to prove association's breach of fiduciary duty claim for developer's alleged failures to establish sound fiscal basis for condo association to maintain and replace common

---

in a like position with respect to a similar corporation organized under this chapter would use under similar circumstances. In performing his duties, a[n] . . . officer . . . shall be entitled to rely on information, opinions, reports or records, including financial statements, books of account and other financial records, in each case presented by or prepared by or under the supervision of (1) one or more officers or employees of the corporation whom . . . officer . . . reasonably believes to be reliable and competent in the matters presented, or (2) counsel, public accountants or other persons as to matters which the . . . officer . . . . reasonably believes to be within such person's professional or expert competence . . . . A[n] . . . officer . . . shall not be liable for the performance of his duties if he acts in compliance with this section. G.L. c. 180, § 6C.

area property and to disclose material facts concerning the condition of the common area
property).

In <u>Cook</u>, the trustee in bankruptcy asserted a single count for breach of fiduciary against
the nonprofit-debtor's former president. CIV.A. 13-11247-GAO, 2014 WL 2615364, at *1 (D.
Mass. June 12, 2014), <u>aff'd sub nom.</u> <u>In re Envtl. Careers Org., Inc.</u>, 597 Fed. Appx. 1 (1st Cir.
2015)(unpublished). The crux of the trustee's claim was that the president "failed to take
corrective action after being warned that [debtor] was misinterpreting government contracts, or
to sufficiently inquire into company practices, or to ensure that proper policies were
implemented." <u>Id.</u> After comparing this allegation to the statutory standard of care for
nonprofit officers contained in G.L. c. 180, § 6C, the District Court reasoned that, "[u]nless the
members of the jury have all had experience 'in a like position with respect to a similar
corporation,' they will need to have evidence from someone with that experience about what
ordinary prudence would call for in that situation. And without it, they will not have what they
need to make a rational evaluation and decision." <u>Id.</u> at *2. The District Court reasoned that the
alleged failures and, "importantly whether any such failure amounted to a breach of the
applicable standard of care under state law, are not matters that a lay fact finder can reliably
assess without the assistance of persons having 'knowledge, skill, experience, training, or
education' concerning such matters." <u>Id.</u> (citing Fed. R. Evid. 702). Accordingly, "[i]n the
absence of expert evidence regarding the standard of care," the District Court awarded
judgment as a matter of law to the nonprofit's president on the trustee's claim for breach of
fiduciary duty. <u>Id.</u>

In a *per curiam* opinion by a panel that included retired justice of the United States

Supreme Court David Souter, sitting by designation, the First Circuit affirmed after *de novo*

review. In re Envtl. Careers Org., Inc., 597 Fed. Appx. 1 (1st Cir. 2015)(unpublished). While

recognizing that "Massachusetts law does not categorically require expert testimony to

elucidate the professional standard of care applicable to officers of a nonprofit corporation," the

First Circuit nevertheless ruled that "the peculiar factual issues underlying the claim, involving

technical areas of government contracting and corporate financial management, are 'substantive

matters beyond the ken'" of a lay factfinder. Id. at 2 (quoting Cook, CIV.A. 13-11247-GAO, 2014

WL 2615364, at *1).[72]

As best as can be gleaned, the "crux" of Tri-CAP's claim is similar to the claim in Cook –

i.e., that Mr. Bronder-Giroux failed to take corrective action, failed to make further inquiry, and

failed to ensure proper fiscal policies were implemented or followed. Compare Tri-CAP Depo.

at 61:4-19 with Cook, CIV.A. 13-11247-GAO, 2014 WL 2615364, at *1-2. And the facts of this case

are similarly peculiar to the facts in Cook, if not more so.

In Cook, the allegations concerned a nonprofit officer's duty in the face of warnings that

certain government contracts were being misinterpreted. CIV.A. 13-11247-GAO, 2014 WL

2615364, at *1-2. This case also concerns the interpretation of funding contracts with both state

and federal government agencies – i.e., whether Tri-CAP failed to adhere to the terms of those

contracts in its disposition of grant funds. Like the trustee in Cook, Tri-CAP here has produced

no evidence from which the jury could reasonably conclude "whether any such failure

---

[72] See also Doe v. Yale U., 252 Conn. 641, 687 (2000) (expert testimony required to prove standard of care and deviation therefrom in novel claim for "educational malpractice" brought medical student).

amounted to a breach of the applicable standard of care under state law" because such

determinations "are not matters that a lay fact finder can reliably assess without the assistance

of persons having 'knowledge, skill, experience, training, or education.'" See CIV.A. 13-11247-

GAO, 2014 WL 2615364, at *1-2.

    This case raises even more peculiarities than Cook which are "beyond the ken" of a lay

factfinder. See id. For example, Tri-CAP alleges that Mr. Bronder-Giroux breached his fiduciary

duty by failing to close the Head Start program in 2011 or earlier because it was losing money.[73]

Alternatively, Tri-CAP has of late implied a theory that Mr. Bronder-Giroux breached his

fiduciary duty by failing to put Tri-CAP into bankruptcy sooner, resulting in "deepening

insolvency."[74] Even if these theories might be accessible to lay persons in the context of a for-

profit corporation with a mission to maximize value for shareholders, Tri-CAP's mission, "to

provide social services in furtherance of the elimination of poverty – and its causes and effects –

in its catchment area, including the cities of Everett, Malden, and Medford," is unique and

unfamiliar. SUMF at ¶ 2. How is a factfinder supposed to account for Tri-CAP's mission when

evaluating Mr. Bronder-Giroux's fiduciary duty in these particular contexts? These are not

---

[73] See Compl. at ¶¶ 21-23. Even if Tri-CAP could prove that Head Start was losing money, there is no evidence in the record from which to infer that Mr. Bronder-Giroux knew it at any point before September 2013.

[74] See, e.g., Motion of Tri-CAP to Amend Complaint, Docket Entry 31 at ¶¶ 12. This theory assumes that Mr. Bronder-Giroux was authorized to put Tri-CAP into bankruptcy, which he plainly was not. See SUMF at ¶ 67. It further assumes that Tri-CAP can prove that resulting harm accrued to the debtor, rather than the debtor's creditors, a distinction which Tri-CAP has not previously been able to delineate. See, e.g., Motion of Tri-CAP to Amend Complaint at ¶ 5 (seeking to add "deepening insolvency . . . as a measure of damages resulting from the Defendants' breaches of their respective duties and resulting harm *to the Debtor's creditors*"). The Creditor Trust, standing in the shoes of Tri-CAP, lacks standing to recover for harm to Tri-CAP's creditors. See Baena v. KPMG LLP, 389 F. Supp. 2d 112, 116 (D. Mass. 2005), aff'd, 453 F.3d 1 (1st Cir. 2006); In re Rare Coin Galleries of Am., Inc., 862 F.2d 896, 901 (1st Cir.1988) ("The trustee steps into the shoes of the debtor for the purposes of asserting or maintaining the debtor's causes of action, which become property of the estate.")

"matters that a lay fact finder can reliably assess without the assistance of persons having knowledge, skill, experience, training, or education." See Cook, CIV.A. 13-11247-GAO, 2014 WL 2615364, at *1-2.

Mr. Bronder-Giroux is entitled to summary judgment because Tri-CAP has failed to produce evidence to prove the applicable duty of care or that anything Mr. Bronder-Giroux did or failed to do deviated therefrom.

### C. Mr. Bronder-Giroux is Shielded From Liability by the Business Judgment Rule.

"In the context of bankruptcy, it is often the case that a failed corporation . . . casts about for someone to blame for the company's demise. And it may be that one or more individuals are liable for wrongdoing. But corporate officers . . . are not liable 'for mere errors of judgment or want of prudence.... [T]hey cannot ordinarily be held to personal responsibility for loss unless there is 'clear and gross negligence' in their conduct.'" In re Access Cardiosystems, Inc., 404 B.R. 593, 679 (Bankr. D. Mass. 2009), aff'd, 488 B.R. 1 (D. Mass. 2012) (quoting Spiegel v. Beacon Participations, 297 Mass. 398, 409 (1937)).

"In most circumstances, Massachusetts courts defer to the business judgment of corporate directors" and officers.[75] MAZ Partners LP v. Shear, 204 F. Supp. 3d 365, 375 (D. Mass.

---

[75] Under Massachusetts common law, the "definition of the private business judgment rule is virtually indistinguishable from the statutory duty of care for nonprofits." Rockwell v. Trustees of Berkshire Museum, 1776CV00253, 2017 WL 6940932, at *10 (Mass. Super. Nov. 7, 2017) (comparing Halebian v. Berv, 457 Mass. 620, 627 n.11 (2010) (the business judgment rule requires a board to perform its duties "in good faith, with the care that a person in a like position would reasonably believe appropriate in similar circumstances, and in a manner ... reasonably believe[d] to be in the best interest of the corporation"), with G.L.c. 180, § 6C (a nonprofit board must perform its duties "in good faith and in a manner [it] reasonably believes to be in the best interest of the corporation, and with such care as an ordinarily prudent person in a like position with respect to a similar corporation organized under this chapter would use under similar circumstances")).

2016), <u>on reconsideration in part</u>, 218 F. Supp. 3d 132 (D. Mass. 2016). "The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." <u>Id.</u> (internal quotations omitted). Under this standard, an officer's "action taken in good faith, even though wanting in sound judgment, does not involve them in personal liability" because the "court does not undertake to substitute its business view for that of those vested with the control of the corporate affairs."[76] <u>Sagalyn v. Meekins, Packard & Wheat, Inc.</u>, 290 Mass. 434, 438 (1935); <u>see</u> <u>Spiegel v. Beacon Participations, Inc.</u>, 297 Mass. 398, 411 (1937) ("if officers act in good faith, albeit imprudently, they are not subject to personal liability absent clear and gross negligence in their conduct"). The burden is on Tri-CAP to overcome the business judgment rule. <u>W. Inv., LLC v. Deutsche Multi-Mkt. Income Tr.</u>, SUCV20163082BLS1, 2017 WL 1103425, at *4 (Mass. Super. Feb. 6, 2017). Tri-CAP cannot meet its burden.

First, there is no dispute that Mr. Bronder-Giroux ever acted in anything other than the utmost good faith. SUMF at ¶ 72. He is therefore entitled to the protections of the business judgment rule. <u>See</u> <u>Spiegel</u>, 297 Mass. at 411.

Second, even if Tri-CAP could prove that Mr. Bronder-Giroux at any point acted "imprudently" – which, without expert testimony, it cannot, <u>see</u> <i>supra</i> at § II.B. – it has not

---

[76] The rationale for the business judgment rule is that court should not second guess officers not involved in self-dealing who use their discretion in good faith on behalf of the corporation because business decisions are often complex and risky. <u>See</u> <u>Houle v. Low</u>, 407 Mass. 810, 824 (1990) ("Massachusetts has always recognized the need for courts to abstain from interfering in business judgments").

produced any evidence remotely implying "clear and gross negligence.[77]" See Speigel, 297

Mass. at 409. Mr. Bronder-Giroux therefore cannot be personally liable pursuant to the business

judgment rule and is entitled to summary judgment as a matter of law.

**D. Mr. Bronder-Giroux is Shielded from Liability by G.L. c. 180, § 6C.**

Lastly, G.L. c. 180, § 6C shields Mr. Bronder-Giroux from liability because he was

entitled by statute to rely on the financials and legal advice from persons more qualified than

himself, including Tri-CAP's outside auditors, Anne Howser (prior to September 2013), Tammy

Glivinsky, Ronald Pierre-Louis, and Rich May, P.C. Specifically, G.L. c. 180, § 6C provides:

> In performing his duties, a[n] . . . officer . . . shall be entitled to rely on
> information, opinions, reports or records, including financial
> statements, books of account and other financial records, in each case
> presented by or prepared by or under the supervision of (1) one or more
> officers or employees of the corporation whom . . . officer . . . reasonably
> believes to be reliable and competent in the matters presented, or (2)
> counsel, public accountants or other persons as to matters which the . . .
> officer . . . reasonably believes to be within such person's professional or
> expert competence . . . . A[n] . . . officer . . . shall not be liable for the
> performance of his duties if he acts in compliance with this section.

In Chokel v. Genzyme Corp., the Supreme Judicial Court held that directors who

retained independent financial advisors to value a proposed stock exchange were shielded from

liability because they were entitled to rely on information, opinion, and reports of persons with

"professional or expert competence" under identical language in G.L. c. 156B, § 65. 449 Mass.

---

[77] "Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence.... It is very great negligence, or the absence of slight diligence, or the want of even scant care.... Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence." Williamson-Green v. Equip. 4 Rent, Inc., 89 Mass. App. Ct. 153, 157 (Mass. App. 2016) (quoting Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 410 (2013)).

272, 274 (2007).[78] There, three years after issuing common stock for its new biosurgery division,

the directors of Genzyme realized that the market performance of the stock did not accurately

reflect the success and prospects of that division. <u>Id.</u> at 328. As a result, the board planned to

announce an exchange of the company's biosurgery stock for Genzyme general division stock.

<u>Id.</u> The directors retained independent financial advisors to value the exchange, and the

advisors opined that the exchange was fair. <u>Id.</u> After the exchange was announced, an owner of

biosurgery stock claimed, *inter alia*, that the directors breached their fiduciary duty by timing

the exchange to occur when the biosurgery stock was substantially undervalued and had just

begun to rise in response to positive news about the prospects of the division. <u>Id.</u> at 327. The

trial court dismissed the claim for breach of fiduciary duty, and the appeals court affirmed. <u>Id.</u>

On further appeal, the SJC agreed, reiterating that directors of a corporation need be free to

exercise business judgments they believe are in the best interests of the corporation <u>and</u> to rely

on information, opinion, and reports of persons with professional or expert competence. <u>Id.</u> at

330.

    Like the directors in <u>Chokel</u>, Mr. Bronder-Giroux was entitled initially to rely on Ms.

Howser, a thirty-year employee whom Mr. Bronder-Giroux had observed for nearly twenty

years effectively leading the fiscal office. Over that time, Mr. Bronder-Giroux established a deep

level of trust in Ms. Howser, and came to believe she was "a very reliable and very competent

comptroller."[79] When Ms. Howser's accounting error came to light, Tri-CAP retained Ms.

Glivinsky as a fiscal management consultant based in part on a recommendation from DHCD.

---

[78] While there is no Massachusetts case interpreting that same language in G.L. c. 180, § 6C, <u>Chokel</u> is nonetheless instructive.

[79] SUMF at ¶ 13.

Given her expertise, Ms. Glivinsky assisted Mr. Bronder-Giroux to prepare a plan to address Tri-CAP's issues. Six months after she was retained, Ms. Glivinsky was replaced by Ronald Pierre-Louis to be Tri-CAP's part-time CFO. Unlike Ms. Howser, Ms. Glivinsky, and Mr. Pierre-Louis, Mr. Bronder-Giroux was a generalist with no specialized financial skills. After Mr. Bronder-Giroux advised the Board to explore bankruptcy on May 2, 2014, Tri-CAP's Board elected not to file after consulting with legal experts at Rich May, P.C. Thus, to the extent any alleged action or inaction by Tri-CAP is fairly attributable to Mr. Bronder-Giroux, rather than to the Board or the Treasurer, the undisputed material facts establish that Mr. Bronder-Giroux was at all times guided by, and reasonably relied upon, the recommendations and advice of, employees and/or consultants who had professional and expert competence in financial or legal matters.

As Tri-CAP's executive director, Mr. Bronder-Giroux was entitled to rely on financial statements and reports prepared by Ms. Howser, its comptroller, Ms. Glivinsky, a fiscal management consultant recommended by the state agency, and Mr. Pierre-Louis, its CFO, and Rich May, P.C., its attorneys. Chokel, 867 N.E.2d at 328. Section 6C therefore shields him from personal liability for the performance of his duties as executive director of Tri-CAP.

## CONCLUSION

The undisputed facts in the record demonstrate that Tri-CAP cannot get over the bar on its claim against Mr. Bronder-Giroux. Accordingly, Mr. Bronder-Giroux is entitled to summary judgment as a matter of law.

21

Respectfully Submitted,

PHILIP BRONDER-GIROUX

By his attorneys,


 /s/ Matthew A. Kane
Matthew A. Kane, BBO No. 666981
Payal Salsburg, BBO No. 568812
Laredo & Smith, LLP
101 Federal Street, Suite 650
Boston, MA 02110
Tel: (617) 443-1100
Fax: (617) 443-1174
Dated: February 28, 2020                     kane@laredosmith.com
                                             salsburg@laredosmith.com


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has this day been served upon each other party or their counsel of record electronically through the Court's EC/CMF system, or, if not registered, then via first-class mail, postage prepaid.


 /s/ Matthew A. Kane
Matthew A. Kane

Dated: February 28, 2020